CHIEF JUSTICE WILLIAMS
delivered the opinion of the court
(JUDGE ROBERTSON dissenting).
This is a contest as to which of these parties are the legal heirs of John Lee, deceased, who died intestate, in January, 1855, at his residence in Newport, Kentucky. There is a class each of uncontested and of controverted facts. It is not controverted that John Lee, deceased, was horn and brought up in Reed Street, New York City; that his father was a tallow-chandler, who had amassed a considerable fortune, which was left to his two children, John and William; that the former was educated and studied law, lived a high and prodigal life until he spent his patrimony, and then secretly left the city; hut how or where he went no witness has stated, but that he afterward appeared in Newport, penniless, dissipated, hearing the marks of long debauchery, and was badly clad; that here he accumulated a considerable estate.
Appellants claim that he went from New York to Maryland, where he followed the tailor’s trade, married Catharine Qarraghty April 19, 1824, and by her had the appellants, James Lee and Ann E. Selman; that after the birth of the latter he abandoned her, went to Tennessee, thence to Newport, where he died.
*217 Appellees deny all this, and insist that their deceased father, 'William Lee, was the surviving brother and only heir of said John Lee, and that they are entitled to his estate. They insist that John Lee did not leave New York until the fall of 1824, and could not have married in Maryland; that he came directly to Newport, where they attempt to fix his residence also in the fall of 1824.
Catharine Lee, the deserted wife, some ten years after her abandonment, intermarried with James Ferrell, at Hagerstown in Maryland, and lived some two years at Hancock in said state, when Ferrell with his wife and the two Lee children moved to Cincinnati, where he died in the year 1846. After which she with her family removed across the river to Newport, where her daughter Ann and husband had lived since about the year 1844. • Mrs. Ferrell testified that said John Lee, deceased, of Newport, was the identical John Lee to whom she was married in the year 1824, and who abandoned her in 1827, and by whom she had the two appellants, Ann E. Selman and James Lee. She is the only witness who positively identifies the Maryland and Newport John Lee as one and the same man, or who knows both.
But the other evidence develops many corroborating as well as contradictory facts; and it is from this mass of seemingly incongruous and contradictory evidence that her statements are to be accredited or discarded.
In traveling through this mazy labyrinth of accumulated incidents and facts and years, we shall only notice such way-marks as exhibit and identify the life and travels of this wayward and prodigal son of the New York tallow-chandler.
Do these facts indicate that John Lee, the Maryland tailor, and the Newport John Lee are one and the same? For, as the Newport and New York John Lee are conceded *218 to be the same, if the Maryland John Lee be identified with either, he is with both; or, in other words, it is then established that the New York, Maryland, and Newport John Lee is the same identical person.
John Lee of Newport had been bar-keeper, clerk, and hostler for Charles Daniel, who kept tavern in Newport. Mrs. Goddard, a daughter of Daniel, says that Lee was at her residence in Newport during the war with Mexico, and seeing her crippled brother sewing, said he had learned the tailor business and had also read law, but did not think much of either trade.
Morris says Lee in Newport told him that he (Lee) was a tailor and had made many coats.
Ackerman says Lee was handy with the needle, and bragged that when he sewed anything it never ripped.
Dicken says some two or three years before Lee’s death he saw Lee sitting cross-legged, tailor-fashion, working very nimbly with a needle, when Lee said he had worked at the tailoring business.
Smally says he heard Lee employing terms common to the trade, indicating familiarity with the business; this was in relation to cutting, and about an overcoat made by one neighbor for another.
McCracken says Lee told him he had lived in New York, and had worked at the tailoring business in Maryland.
This strong, positive, and accumulated evidence that John Lee of Newport was a tailor, and had at one time followed the business, and that too in Maryland, is not overcome nor repelled by the appellees’ negative evidence, especially as other witnesses proved that he used the needle with facility; and that a sufficiency could be learned by a person of ordinary capacity in a few months to enable him to do fair journey-work, with the aid of rules gotten up and taught by experts.
*219 It is proved then that John Lee of Newport was a tailor, and that he had also read law, and that he followed the trade in Maryland, which he must have learned after leaving New York.
Had John Lee of Newport a wife and children?
Mosher, of Newport, says that in 1844, when his wife was absent several weeks, he slept with Lee, who then told him he had lived in Baltimore, and had a wife in Maryland.
Sandford says he thinks he heard Lee say he had a wife and child, or children, and had left them somewhere JEast.
Lydia Elliott says that in 1882 Lee was at her house looking sad, and when asked by her husband what he had to make him sad, Lee replied he had a wife and two children, and that he had had trouble and left them.
Wright says he was acquainted with Lee before he left New York; that on Lee’s second visit after leaving he told witness he was married and had one child; the next time witness saw him he said he had two children; witness saw him both times in New York.
Paris says Lee returned twice after he left New York, and heard Lee say he had a wife and children; and witness talked with Wm. Lee repeatedly about his brother John, and William stated John toas out West and doing passably well, and had a wife and children.
Tarr, one of appellees’ New York witnesses, says that he knew John Lee and his father; and that two or three years after John left new York he met him in the city, when he said he was going back, somewhere West or South. People told him John was married, but not in New York; and John said he was, and had two children.
Dicken says that in Newport he told Lee he ought to take a wife and raise a family that he might have heirs to his property, when Lee replied that he had two heirs.
*220 That John Lee of Newport had a wife and two legitimate children is thus established, and is neither rebutted by appellees evidence, nor accounted for on the hypothesis that he had a kept mistress in Cincinnati by whom he had children; for his recognition of having a wife and children was before the time he had the mistress as well as afterward, nor would his brother William have recognized her as a wife. If the Newport John Lee had a wife and children, so had the New York John Lee; and that he had is established out of his own mouth, and that of his brother William, who was appellees’ immediate ancestor, and claimed to be John’s only heir.
Whence came John Lee to Newport? Helm says the first he saw of John Lee was in Newport, keeping grocery in the Baxter House for Kinney, who was from Tennessee. “Lee told me that he came from Tennessee with Kinney.”
Daniels says John Lee said in coming to Newport he traveled through Kentucky, and spoke of his penniless condition and the hospitality of the people of Kentucky.
This evidence, though not so satisfactory and convincing as the preceding, and much more nearly rebutted by the countervailing evidence of appellees, yet connected with other facts not yet related, identified Tennessee as the immediate place whence he came-to Newport.
How then did he get to Tennessee ? Thomas, of Elizabethtown, Kentucky, says in 1827 and 1828 he lived in Cumberland, Maryland; was employed by Reside, the mail contractor; knew Elintstone, Maryland, and knew John Lee, who resided there, about 1827. He (Lee) drove stages for Reside occasionally, and did other business for him. He left for Virginia and Tennessee in the fall of 1827 to put stock on Reside’s mail route from Christians-burg, Virginia, through Wythe Court-house and Abingdon, to Blonntsville, Tennessee. Witness accompanied him to *221 Abingdon and within fifteen miles of Blountsville. Lee was to remain on this route until Mr. Robinson, a partner of Reside, learned the business of staging. "Witness never saw him afterward. Lee removed from Hancock, Maryland, to Elintstone, and witness’s recollection is he came from New York or New England to Hancock.
Other witnesses state that John Lee, the tailor, and husband of Catharine Garraghty, left Maryland with Reside to go on his mail route West; so that there is but little doubt that John Lee, the Maryland tailor, and husband of Catharine Garraghty, left Maryland in the year 1827 with Reside on, his Virginia and Tennessee mail line, and he is traced with ' certainty to within fifteen miles of Blountsville.
It is further proved by other witnesses that John Lee of Maryland, had had trouble with his wife and family; he also had trouble with a girl not of his family, and because of these things had left Maryland, being dissipated, debauched, and poor.
When John Lee appeared in Newport he was rough, dissipated, without money, and badly clad. He came from Tennessee, to which state the Maryland John Lee had gone. John Lee of Newport kept the books of his landlord, wrote a good hand, and was fond of flourishing with his pen. John Lee of Maryland wrote a good hand, seemed to be well educated, and was fond of flourishing ■with his pen. Several witnesses who were well acquainted with his handwriting in Maryland examined the books kept by the Newport John Lee, and they are of opinion that the handwriting is the same. Several witnesses who had often seen John Lee of Newport write, and were acquainted with his hand, examined a note proved to have been executed by the tailor Johu Lee, in Maryland, and they express the opinion that the signature to *222 the Maryland note is in the handwriting of the Newport John Lee. Several experts were examined by each party, and these differ as to this matter, and there are also differences among those who knew the handwriting of John Lee.
There was doubtless some similarity in the appearance of the Maryland tailor and the Newport John Lee, though the witnesses differ even in describing the same person, as to the height, weight, color of eyes, hair, and the general tout ensemble of the man; and which is not surprising when it is remembered they are testifying near forty years after his departure, and when there was nothing to peculiarly attract their attention to these things when he lived among them. The similarity or dissimilarity as derived from this evidence, therefore, we regard as unreliable, and entitled to but little consideration, especially when contrasted with the appellees’ evidence as to the differences in the New York and Newport John Lee confessedly the same.
The New York witnesses describe him as a gay, well-dressed, extravagant, dissipated young man; while his first appearance in Newport is described as being “very wretched, one having the appearance of a poor, drunken castout; his nose and face were marked with drunken red splotches.” Again, he is described as wearing old “corduroy pants .and wampus, blouse, green-baize coat,” and attending to the most menial business of the tavern, such as hostler, etc. A wonderfully sudden transformation! The weight of evidence, properly analyzed, establish these facts in corroboration of Mrs. Ferrell’s positive testimony:
1. That John Lee of .Newport was a tailor and had read law.
2. That he had followed tailoring in Maryland.
3. That he had there a wife and two children, whom he had abandoned.
*223 4. That lie came to Kentucky from Tennessee.
5. That the tailor John Lee bad left Maryland and gone to Tennessee.
6. Tbat tbe bandwriting of tbe Newport and Maryland tailor were very similar.
7. Tbat it is conceded tbat tbe Newport and New York John Lee were tbe same.
8. Tbe descent, in appearance, pride, situation, condition, etc., of the New York to tbe Newport Lee required a considerable time of continued reckless habits of dissipation, degrading tbe intellect, reducing tbe pride and self-esteem of tbe man; all of which are highly improbable, if not impossible, in the same autumn and winter.
Now, to disprove all these corroborating facts, it is insisted tbat John Lee did not leave New York until tbe autumn of 1824, and appeared at Newport tbe same season, rendering it impossible tbat be should have married in Maryland in April, 1824, and should have lived several years with bis wife before be abandoned her and left there. But a logical examination of this evidence as to time, place, and facts will to a great extent dispel this seeming difficulty.
Tbe evidence shows tbat when be came to Newport be went into tbe bar of tbe tavern and kept it for Kinney, who likely did business under Baxter’s license, who then kept tbe tavern. Kinney was from Tennessee, and soon returned and died. Taliaferro soon took tbe Baxter House and kept it, and Lee did business for him. Daniel next took tbe bouse, and Lee did business for him.
Newport was then but a village, and tbe tavern, though tbe prominent one, was small, and kept in ordinary style. Lee performed tbe most menial services about tbe bouse as well as attended the bar. Tbe marriage license proves tbat John Lee and Catharine Garraghty were married *224 April 19, 1824. The note in this record, signed by Lee in Maryland, is dated September, 1827. The evidence shows that he finally left Maryland soon after signing-said note, and went West on Reside’s mail route. The tavern license of Taliaferro is dated March 25, 1828. Daniel’s are dated May 25, 1829, and June 28, 1830. The assessor’s books show an entire absence of John Lee’s name until the year 1829.
The poll-books of Newport for the years 1825 and 1827 show no John Lee, that of. 1826 being lost; but he voted in 1828, 1829, and 1830 in the town election. The evidence identifies the men with whom he did business, and as to this there is no contrariety. The license fixes the period when they did the business with much more reliable certainty than the frail memory of any number of witnesses. Lee was a great partisan: in New York, a Tammany-hall Democrat; in Newport, a coffee - house, street, hustings Democratic politician. Had he gained a residence, it can hardly be supposed he would not have voted in the memorable presidential contest of 1828 between Jackson and Adams, which he did not.
Being- a rather conspicuous character-, and at the leading hotel of Ne-wport, the assessor would hardly have missed him for a series of years down to 1828, and then found him every year afterward, as is manifest from the assessor’s books. The only records jmesented ^y appellees with which John Lee is connected are the deed of release executed by John to William Lee, September 3, 1823, wherein he recites his place of residence as New York City.
His assignment of a lease to his brother William, October 2, 1823, and acknowledgment of writings before Bogart, a commissioner, seven days thereafter; and a receipt to his brother William, dated “New York, Jan *225 uary 30, 1824,” being for a specified sum and “balance of all accounts between us for rent, board, or otherwise to date hereof.”
These records certainly indicate his preparation for departure, and with the other evidence indicate that he did leave New York in the winter of 1823-4; also impressing the mind with an error in Mrs. Elizabeth Lee’s evidence as to the date of his departure by about one year, or near that.
Dates, of all other things, are the most uncertain and unreliable when fixed by the unaided recollection of witnesses; nor is a mere reference to records not connected with the subject of contest more reliable. This is peculiarly manifest in this case by a very confident witness, who fixes his first acquaintance with John Lee by certain criminals who had their examining trial at the Baxter House, where he then drank with a named gentleman, and Lee was the bar-keeper who waited on them, when it was afterward developed that the gentleman named had removed from. Newport two years before. This witness also fixed it by the fact that he had recently returned by land from New Orleans, and that the ground was frozen in Kentucky when he returned; while these records show that said trials began September 7 and ended September 10, 1824, and indelibly stamps error as to dates by this witness; nor can any one believe the ground was then frozen. Another confident witness speaks of seeing John Lee crossing the river while a certain contractor was improving the wharf at Cincinnati, and says it was in 1824; but these records show it was several years later. These criminal trials in Newport were before appellees’ evidence shows John Lee left New York.
Some witnesses fix John Lee’s residence in Newport in the year 1824 by his occupancy of a small house — not *226 the Baxter tavern — known as his jug tavern; yet nearly all agree he had lived with Baxter, Taliaferro, and Daniel before he occupied said house, and the date of their license clearly fixes this date after 1828.
If it were clearly proved that John Lee was at the celebrated race between Eclipse and Henry over the Long Island Course, in May, 1823, still this would not disprove his subsequent residence and marriage in Maryland in 1824. Besides, it is well established that the tailor Lee was absent frequently and occasionally for weeks at a time; and it is also well established that John Lee returned several times within a few years after he left New York, notwithstanding Mrs. Elizabeth Lee, appellees’ mother, says it was ten years before he return ed, and that he was neither married when he left nor when he returned; and fixes his departure from New York in September, 1824.
But this imposing train of evidence tending to the legal and logical conclusion that the Newport and Maryland John Lee were the same, and therefore identical with the New York John Lee, is greatly strengthened by the moral evidence in the case.
1. The habits and vices of the young John Lee of New York and of Maryland were the same.
2. The education and manners of the Maryland tailor evidenced, what he there said, that he had seen better days, and had been in better society than his then position indicated.
3. The interest which he took in Mrs. Selman, though apparently an entire stranger to her; sometimes looking at her with much seeming interest, and saying she was the prettiest woman in Newport, while no witness even intimates that she had more than a common share of beauty.
*227 4. His embarrassment and agitation when Mrs. Ferrell, on a single occasion, went to his confectionery to purchase candy.
5. The resemblance of Mrs. Selman to him, and the more striking resemblance of her brother, not only in general personal appearance and expression of eyes and countenance, but also in some peculiarity of habits.
6. The identity of name.
7. The utter hiatus in the life and travels of the New York John Lee between his departure therefrom and his arrival at Newport, unless he was the tailor John Lee of Maryland.
8. The entire loss of the Maryland tailor John Lee, unless he was the Newport John Lee.
9. The utterly impossible transformation of the gay, tidy, nicely-dressed, and dashing, though reckless, young lawyer of New York into the rough hostler and, as some expressed it, “ wharf-rat,” badly clothed, bloated, red-nosed, drunken, debauched, and degraded John Lee, as he appeared at Newport, in so short a time, if he came directly from New York.
10.The impossibility of his being a tailor and having worked at the trade unless he had wandered a long period^ on the route.
And although it is difficult, if not impossible, to reconcile any theory with the dates as given by the witnesses, whether of the one side or the other — for these not only conflict with their adversary, but differ among themselves— yet knowing, as all courts must, the great infirmity of the human mind as to periods of time and the date of events, and leaving a very large margin as to these for both sides, the other established,_ conceded, and controlling facts render it highly probable that John Lee left New York early in the year 1824; by some means fell in with a traveling *228 journeyman, tailor, who may have taught him a sufficient knowledge of the trade to do such coarse work as was proved to have been the character of the demand on the national road in Maryland, where he appeared shortly before his marriage in April, 1824; for as to the manner and exact time, and how he left, and whither he went, no witness has or likely can explain.
But that he had then spent his patrimony, though still well dressed and genteel iii his appearance, is certain; and that he could not very soon have appeared in Newport the metamorphosed person which John Lee was when he arrived there is doubly certain.
The seemingly strange conduct of appellants in setting up no claim to this estate for over five years after John Lee’s death, and paying no attention to him in his lifetime, though living in the same town with and knowing of him, is urged with much power and ingenuity against them. It is often difficult and sometimes impossible to divine human conduct, for the secret but prompting motive frequently can not be made tangible.
Mrs. Ferrell, however, was a-Catholic, and had violated a law of her church by her marriage with Ferrell, and had also imposed on her priest by saying her husband Lee was dead. Lee’s long-continued absence for ten years after he abandoned her, without any information from or of him, would by our laws raise the presumption of his death and authorize her second marriage; but this may not have been so by the laws of her church, and we presume not from her calling it a mortal sin for which she had atoned.
Her impoverished condition after her father’s death, with two children to raise, rendered it greatly desirable with her to better her situation; hence she determined to marry at all events, but by reporting Lee’s death she could *229 marry according to the custom of her own church. She and her family, consisting of the two Lee children and one Ferrell child, seemed to be occupying a respectable social position at Newport. John Lee, though a man of some property, did not occupy that position in society of which a sensitive wife or children could be proud.
Beside the violation of the rules of her church and the imposition on her priest, she and her children, at first, would naturally feel a repugnance in developing this sad and cruel part of her family history, and making themselves obnoxious to the animadversions of the gossiping and unfeeling part of society.
But as time wore on, and the allurements of property and the mercenary motives of human nature had been heard and felt, their repugnance grew weaker, while the desire of possession grew correspondingly stronger, until at last the decisive time had arrived in which they must act and set up their claim, else the estate would go into the possession of collateral kindred, and perhaps be forever lost to them.
Evidently here was a contest between pride and delicacy on the one hand, and interest and profit on the other. Human experience has rarely seen the ultimate triumph of the former over the latter, especially when the contest has been permitted to linger in the lap of years, and more especially when interest and inclination have been sustained by a strong conviction of right, justice, and law.
But whatever may have been the active incentive and controlling motive, we are reasonably confident that tbe John Lee of Newport has been identified as the tailor John Lee of Maryland and who had there abandoned his wife and children, and of course as the John Lee of New York; and therefore, as these appellants are unquestionably the legitimate children of the Maryland John Lee, *230 they are the beirs at law of the clecedent, John Lee of Newport, and as such entitled to all his real and personal estate. We are fully sensible that in arriving at this conclusion it has been difficult, if not impossible, to reconcile much of the evidence as to when John Lee left New York and arrived at Newport; yet a few well-established and prominent facts show they must have been of distant periods, and not in the same season or year. The health, appearance, habits, condition, and position in society, with the education, pride, and self-esteem of John Lee when he left New York, could not possibly have been so suddenly transformed into the low, vulgar, debauchee of Newport, ready to do the most menial service at the bidding of his landlord, who on one occasion cursed him about the horses.
The New York John Lee could not in so short a time have learned and worked at the tailor’s trade. It was impossible that he could have had a wife and two children had he gone immediately to Newport. These things required a series of years, and habits of dissipation degrading to the man, and reducing his manly pride and self-esteem, and sinking him far beneath his rearing and education.
The Newport Lee being a tailor, working at his trade in Maryland, having a wife and children there whom he deserted, and his going West, are proved positive facts, inconsistent with any idea of his direct arrival from New York, and within any reasonable time for even a desultory wandering from the one place to the other.
The only reliable writings and records with which he is connected, and which unerringly fix the dates of his last residence in New York, are the records and writings of the transfer of his leases, receipts, etc., given his brother William, dated in September and October, 1823, and *231 January, 1824, and it is not impossible he should have left and returned again before he gave the last. The only reliable records with which he is connected fixing his arrival in Newport are the tavern license of Taliaferro of March, 1828, and of Daniel of May, 1829, and June, 1830, and the poll-books of 1828, and assessor’s books of 1828-9-30. The only reliable records fixing about the period of Lee’s arrival in Maryland are his marriage license of April, 1824; and that of his departure, his note of September, 1827.
These facts certainly strongly indicate that Lee left New York early in 1824, went to Maryland, married in April, followed the tailor’s trade until his departure in the autumn of 1827, and arrived at Newport in the fall or winter of 1827-8. That there are facts militating against this is true, but not with the convincing effect that the established prominent facts repel the theory that Lee came to Newport directly from New York within any reasonable time. The established prominent facts are so strongly corroborative of Mrs. Ferrell’s positive statements that her Maryland husband and the decedent John Lee were the same and identical, that we do not feel authorized to disbelieve her statements and discard her evidence as untrue.
Wherefore the judgment is reversed, with directions for further proceedings consistent herewith (Judge Robertson dissenting).